O. S. v. Fairfax County School Board, No. 14-1994. Mr. McAndrews, whenever you're ready. May it please the Court, my name is Dennis McAndrews, together with my co-counsel, Caitlin McAndrews. I'm here on behalf of the appellants in this matter. I'd respectfully request the opportunity to reserve five minutes for a rebuttal. The fundamental question in this case is, what is the standard of an appropriate education under IDEA 2004? That is the current special ed statute. This question permeates everything about special education. From the development of an IEP, to a due process hearing, to review by a district court, by review by this court. It is a fundamental, critical aspect of IDEA. In Rowley, the Supreme Court decision, the first Supreme Court decision to look at special education in this country, the court talked about the purpose of the law then being access to special education. When the first special ed law, which is the one that Rowley considered, it was the Education for All Handicapped Children Act, when that was enacted in 1975, there were a million kids in this country who had no education at all because they were disabled. A million. Zero education. It wasn't they got a lousy education, they got nothing. I personally, in my own career, have talked to many of the parents who walked their kids into school on day one, were told to go to the principal's office, and the principal said, we don't teach kids like yours. That's what Rowley was dealing with. And then they walked their kid through the playground with everybody else who was going to have the next 12 years of education. That's what Rowley was dealing with. Zero access. And another four million kids who were sitting in regular ed, who were disabled, and who the court said were essentially waiting to drop out. I graduated from what I think is a reasonably good education department in 1975. The first time I heard the word science in my curriculum was when I walked across the stage in May of 1975, and they said Dennis McAndrew's Bachelor of Science in Education. What probably is helpful to me, at least I'm here, I'm moved by the argument and the way you're presenting it, what's probably really helpful is to go to the issue of the case, at least in terms of what's here. And you make some representation, I think, that the wrong standard was applied here. Yes. This is not a some benefits standard, which I think Rowley clearly says it would be, but in fact the court should apply a higher standard of meaningful benefit. And there is a purpose for my historical background. I'm just letting you know that you probably can assume we've really read through this pretty carefully and understand that. I'm not trying to take away from what you're saying. I think what you're saying is perfectly good, but we just have a short period of time, and that's really kind of the nub of this case. This isn't the first E.A. case we've had. Understood. This is what Rowley did, though. Rowley recognized that in the 1975 act they were building the plane as they flew it, that there was no special ed for a million kids and virtually none for another four million. So access was everything about the Education for All Handicapped Children Act. So we're asking this court to do exactly what Rowley did, take the situation, take the act as it is, as it presented itself then as it presented itself now. The act today is entirely different in purpose, in scope, in function than it was in 1975 and in 1982. When Rowley looked at it, the word science doesn't appear in the 75 act. The word science appears over two dozen times in the current act. The word function, how kids function. But is the point that Rowley essentially set up some benefit standard and you are articulating it's a higher standard, that's a meaningful benefit, what shows us that? What shows us that is a few things, Your Honor. First, seven circuits have now used the meaningful benefit standard. That is certainly the majority view in this. Rowley said the purpose of the act in 75 was access. Just give kids access to education. In fact, that's a specific quote from it. And it said providing handicapped children access to a public education became the purpose of the act. The current act expressly says the purpose is results. It's not access. It specifically says we finished access long ago. When Congress reauthorized this act in 97 and 2004, they said, and, in fact, the United States Supreme Court in the Forrest Grove decision said, you know, we're beyond that. We're beyond access. The whole question is, says the 1997 amendments were intended to place greater emphasis on improving student performance and ensuring that children with disabilities receive a quality public education. That's the United States Supreme Court in Forrest Grove in 2009. The concept of meaningful education, the word meaningful actually appeared in Rowley. Rowley said the purpose of the act is access, period. And it said that access must be meaningful. That's a quote from Rowley. So now that the act has changed. But our interpretation, at least the court cases that have followed Rowley, sort of articulated this some educational benefit standard. And if there is a change, then as you articulate, as I understand it, you're saying something changed since then to move that standard to a higher standard, even though we have, over the years, followed Rowley. And you're telling us now that it has changed. Well, it's because nobody's really made this argument to you. And it appears to me, counsel, with all respect, appellants didn't make this argument either, either before the ALJ or before the district court. And it would be helpful to me if you could point to us, point us in the record, where you actually made the argument that you're making, not that you have to, but that it would be helpful to me because it's important, it seems to me, in this context, as in others, that the decision makers have the opportunity to respond to arguments, particularly nuanced arguments such as the one you're making, about the content of a legal standard. Well, first of all, when we're before the ALJ, I don't think we have any choice. We've got, that's an administrative process. We don't have choice to educate an ALJ about the law? Oh, no, I think we do. Well, that's what we're talking about. No, but I'm saying that the courts here in the Fourth Circuit had used some progress or educational progress. But I believe that if you look at the opening statement, the word meaningful was used, that it's meaningful education, and certainly in the complaint. Is it some educational benefit or some educational progress? Meaningful, well, I think either one. I think they're equivalent. Benefit and progress, to me, are the same, essentially. We didn't just say that. We also told you what that some benefit was. I mean, it wasn't just a naked term, some educational benefit. It went on to say that it meant that you had to provide them with something that was more than just a trivial or a minimum educational benefit. I mean, that sort of imports that it's got to be meaningful. I mean, it's got to be more than just any benefit. It's got to be something that's going to be more than a minimal benefit. We said that in 1985. Said what in 1985? What Judge Wynn just wrote to you, or just read to you, that it has to be something more than a minimal academic advancement. Right. And it really is trivial, we said. That's right. And there is a huge difference, Your Honor. Having practiced in states that use meaningful educational benefit and some educational benefit, it is night and day in terms of what is expected in IEPs, in terms of what's expected at the ALJ level, in terms of what's expected at the district court level. The definition, the Webster definition of some means a person or thing that's not known, named, or specified, an unspecified amount or number. The definition of meaningful is having real importance or value. It is night and day. And when I say it makes an entire difference in terms of whether a kid's going to be a productive, independent member of society, and those are the terms of IDEA, self-sufficiency, independence. Those are the terms that are used. Every kid makes progress. Every kid makes some benefit. Not every kid makes meaningful benefit. And if that's our target, if our target is some non-trivial progress, that's what we're going to get. And that's what we got with Owen. Owen regressed. If you look at page 515 of the record, I think 515 of this record, of this appendix, shows us what happened to this young man in a system that viewed any progress, non-trivial progress, as acceptable. He has a 103 IQ, which puts him in the 58th percentile. And if you look at page 515, the percentile ranks of where he was at after the district had him for two years. And, by the way, this is a young man who three years earlier this district said was not eligible for special ed. So this is not, you know, a pervasively disabled kid by any stretch. He's got an IQ that puts him above average. His reading composite is in the fifth percentile. His math composite, the fifth percentile. His written expression, the 16th percentile. His decoding in the seventh percentile. This is a kid who's being left behind. And we can say, oh, he has a disability. He's going to progress more slowly. He probably will, but not at that level. You know, No Child Left Behind and the National Reading Panel have all said these kids with appropriate instruction can make a year's worth of progress in a year if they're instructed appropriately. The IEPs in this case have no specially designed instruction. The idea in Section 320 says that the IEPs have to have a statement of the special education the child will receive. And Section 39 of the code of the regs, 300.39, says special education is specially designed instruction. There's no statement. Zero. None. Let alone the research-based instruction that IDEA mandates. And that's why IDEA is so different. Mr. McAndrews, I, we, I'm sure, really appreciate your advocacy. I mean that very sincerely. And we have no doubt that these parents have absolutely done everything they possibly could to enhance their son's opportunities. There's no doubt about any of that. But I'm having difficulty. They didn't bring in an expert. And I don't say that to criticize them at all. But you're here arguing to us, I think, if I understand, that the appellant should prevail here and we should rule in your favor. I mean, you're not even asking for a reband, right? This court has a choice. You want us to render judgment. This court has a choice. I know, but what you're asking for is for us to render judgment as a matter of law on this record that there was a failure here. And I'm, I'm not, I'm not seeing how we get there. Well, this court can certainly remand. I mean, you know, I, we, this court has said in the past, if the record is comprehensive enough, and we can, this court can review the record the same way as the district court. There are conflicting opinions of this circuit as to what the review is. But there are cases where this court has made the decision without remand. There are other cases where the court has remanded back to the district court to apply the correct standard. The district court's court. See, that takes me back to my earlier question. The district court wasn't given the opportunity, assuming for the sake of discussion, that the standard you're after here is different from the Fourth Circuit standard. I'm almost sure. I'm sorry. I'm not clear that that's true. I understand your semantic argument, but, but I don't see how that's true based on what you're, what you're offering to us. The Fourth Circuit has said for decades that more than trivial outcomes, progress is required. The district court understood that in this case. And we have the record that we have. I'm just at a loss to understand. You want evidence of better progress. We raised. We all do, of course. We raised in the district court that the standard should be meaningful progress. That court rejected it. We raised that issue in the district court. And I can certainly provide a post-hearing submission, Your Honor. I believe we raised it in the complaint. I'm not asking you to do that. No, that was raised in the district court. And the district court, in its oral opinion, said over and over again, it's progress. It's some progress. And we're not asking you to overturn Rowley. We're asking you to look at the statute. But we can't overturn Rowley. Right. I'm not. And what we're asking you to do is to look at the statute as it exists today, where it's an entirely different statute, where it says the purpose is results for kids, not just mere access, not just some benefits. So your submission is, in every idea case, if there's not some quantum of progress, measurable progress, as a matter of law, the parents or the guardians are entitled to what? In other words, it's a strict liability. What you're arguing for is a strict liability type of statute. Absolutely not. What it is is if the parents, and the parents now have the burden of proof in terms of establishing the lack of meaningful progress. But the parents here didn't bring in an expert to point out where the county's plan was deficient. You don't have to have an expert. I didn't say you had to. But if you don't, how is a court to say the results were the product of a deficient IDA? Two ways, if I may, Your Honor. You're sort of out of time, and you've got some time for rebuttal. But I think we should hear from the other side. Do you want me to answer that question? I can do it very quickly. You can do it on rebuttal. Whatever you say. On rebuttal, too, if you will, go back to the 2004 statements. You say therein mere access had been moved over to be meaningful. But your primary source for that is the findings and purposes section of this 2004 Act. And, in fact, most of it comes from the 1997 Act, where we've been over this thing many times. But what I want you to do when you go there is let me know how Congress has amended the definition of free access to public education. I think that's where we will be bound by, because the interpretation that we rendered in Raleigh arose from that, not from findings and purposes and other things there. But just, if you will, address that when you come back. Ready to do it. Thank you. Thank you. May it please the Court. Your Honors, John Cafferkey for the Appley Fairfax County School Board. At the Council table with me is Co-Counsel Tricia Minson. Members of the panel, I want to start off by talking about this legal standard issue, not because I think it's dispositive of the case, as I'll explain. I don't think it is. And, in fact, I think what we have here is a straightforward application of the standard that the Supreme Court gave us in Raleigh in 1982 and that this Court has continuously applied, really, since the Hall v. Vance County case in 1985 and Hartman and through the Court's most recent. But the standard is the same. The standard is the same, Your Honor. And what was going on? That's correct, Your Honor. The law, Council said, its very first sentence was, the act today is completely different. So there's been no movement from mere access, at least the focus of it being mere access, to a higher standard of meaningful benefit? The word meaningful actually comes out of Raleigh, which said meaningful access. So the notion that benefit has to be, or that at least access has to be meaningful in the sense of more than trivial, more than negligible, is something that, again, has been in the case law since Raleigh. But the core, and the law has been amended in 91, 97, and 2004, and there have been some changes, and I'll talk about them in just a moment, but the core obligation of IDEA, or before that the Education of All Handicapped Children Act, is that the school division is responsible for providing an appropriate education. That's now found at 20 U.S.C. 1412A1A. That requirement to provide, quote, unquote, an appropriate education has been in the law since it was first adopted in 1975. Raleigh tells us that it means not the maximum education, but an educational plan that's reasonably designed to offer some educational benefit. Again, that comes at page 200 of the Raleigh opinion. This court has said that in Hartman in 1997, and most importantly, in the A.B. v. Lawson decision in 2004, where it's italicized some educational benefit. That's an indication that the- So let me understand, and just help me out at least, because they presented objective evidence at least showing that this child had regressed, and yet the standard does apply to some educational benefit. Is there interaction there, or do you have to show, well, there is some benefit? You have to come back and show there's some objective information, there's some benefit you got, or a meaningful benefit? I would say two things, Your Honor. First, the burden is actually on the plaintiffs here under the Schaefer v. Wiest case, so it's their burden to show that there has not been educational benefit, that the school division is not offering educational benefit. So when they show an objective test showing a regression, that's not meeting the burden? Well, the second thing I would say, and this is what both the hearing officer- There was lots of evidence, lots of objective evidence in the form of other objective either standardized testing, what's called criterion reference testing, IEP progress reports. You know, one of the things that IDEA, speaking of it being amended, one of the things that one of the amendments did is say you have to have on the same cycle as report cards a detailed progress report of how the student's doing on their IEP goals. In fact, we reproduced some of those pieces of that in our brief because I thought it was important. It was something that the hearing officer relied upon and something that Judge Ellis relied upon, showing how the student had progressed in various areas, reading, math, written language. That's objective evidence. The goals are put in terms of, for example, student will write three sentences on a topic in three or four trials, and then you see as the student goes through the year, they start out doing that sometimes, and by the end of the year, the student has mastered that, or the student will be able to identify numbers 1 through 31. Again, at one point in the year, the student is doing that inconsistently. By the end of the year, first grade, I think, the student is doing that consistently. It's set out at pages 6 through 16 of our brief, but that's objective evidence just in the same way, and that's the kind of evidence that IDEA says school systems that you should use. It's on something called a Likert scale, which is discussed at 511, I believe, of the Joint Appendix. But there's that. There's other kinds of objective testing. There's something called the Developmental Reading Assessment, the DRA, where the student at one point goes from an 86 to a 166. So there's lots of different kinds of evidence, objective and otherwise. There are the narrative comments from the student's tutor, and we subpoenaed those. The student's tutor, who was employed by the parents, could have come in and testified, but didn't. The student's tutor said, nice progress coming along in reading, able now to reread something that they don't understand and so forth. We reproduced those in the brief. But in answer to Your Honor's question, there was a lot of evidence, a lot of objective evidence, and both the hearing officer and Judge Ellis, in fact, Judge Ellis says towards the end of his opinion, I recognize that there's this testing, but it's swamped by all the other evidence. And by the way, just to look at the testing for a minute, just to be clear, I mean, a couple things are important. We're talking about this is part of an evaluation that was done privately by the Kennedy Krieger Institute that was procured by the parents, actually two evaluations. The person who did that testing didn't come and testify, although certainly they could have done that. And in fact, in these administrative hearings, often people testify by telephone, so you don't have the expense of having them come sit around. That didn't happen. The only person who testified was the school system psychologist who said a couple things about this one particular test. By the way, on this retinue of testing, there were seven different tests given by Kennedy Krieger. We're talking about one part of one of those. And as to that, the only expert witness who testified, the school system psychologist, said, yes, I'm familiar with that test. That's not a very good way to assess progress for a student who's in kindergarten and first grade. The Woodcock-Johnson 3 is a test that can be given to preschoolers all the way through adults. So what she said is it's not very sensitive in getting at educational progress when I think the first time the student took it was they were in kindergarten and the second time they were in first grade. And so the difference between getting one score and another can be as little as one test item. That's a lot. The second thing, another thing about that test is, as the record indicates, and Judge Ellis emphasized a couple of times, you have 180 days in the school year. The student was absent for part or all of 51 days. You were appropriately responding to Judge Wynn. But we're here on questions of law. Yes. I mean, I know you know that, and I know counsel know that. We're not a jury. We're not an ALJ. We certainly aren't experts in psychology and developmental milestones and all of that. And so that's part of, I think, what we're trying to grapple with here. Counsel, I think appropriately for the appellants, have come up here to the Fourth Circuit to say, as a matter of law, the district court got it wrong. And we're here trying to figure out, and I think Judge Wynn was, of course, trying to get you to talk about it, but you're talking about the facts, which is fine. It's appropriate. But as a matter of law, how do we decide this case? And so to come back to that, Judge Davis, and, in fact, to pick up on the question you had asked the appellant, if you look at 2028 and the succeeding pages of the administrative record, this case was briefed at the district, excuse me, at the ALJ level using Rowley and using this court's decision in Sumter County versus Heffron, which is a sum benefit means more than trivial or negligible. That was the standard that was applied at the ALJ. The notion that IDEA has changed in a fundamental way to somehow overrule Rowley I think is just not borne out by the statutory language. What counsel points to is some statements in the prefatory language, but the core obligation to provide an appropriate education, that hadn't changed. The legislative history doesn't indicate that. What do you say about that Third Circuit case that sort of floated out there? Well, what I would say about that, what I would say a couple of things. The Third Circuit, and I recognize that counsel practices extensively in the Third Circuit, that's not a new idea in the Third Circuit. They went on that track as early as 1988 in the Polk v. Central Susquehanna. What I would say is that's a minority rule. There are some circuits, the Third Circuit in the Polk v. Central Susquehanna, the Sixth Circuit in the Deal case in 2004, and then most recently the Ninth Circuit in the, I think it's called NG v. Hellgate Elementary School District. They have come to the conclusion that IDEA somehow requires more, and I would just say to you. More what? More what? That there's a somehow elevated standard, and I don't want to miss the point. Excuse me if I'm wrong. I thought your arguments on the standard were, one, it wasn't raised below. Maybe you don't make that argument. That was answering Judge Davis's question. It was raised in the district court. It really wasn't raised at the administrative hearing. They made the argument that the wrong standard was applied. In the district court, yes. Housing. Okay. Number two, that the, I thought your argument was that it didn't make any difference, that this was all the same standard, that even if different language was used, that courts were, these courts that you say have gone off on a different track, I thought you said that they would. No, I wouldn't. You think that they require more? I would say that a couple of the circuits, the Fifth Circuit and the Adams case. Yeah, you were just talking about them. And the Tenth, not the Tenth Circuit, the Tenth Circuit, as we submitted supplemental decision from a couple of weeks ago. And the Ninth Circuit? The Ninth Circuit in the NG versus Hellgate decision from 2008, it says at footnote three that the 1997 amendments have somehow adopted a higher standard. It cites the no authority. Okay, I know they say that. But what I'm asking you, is the result any different? No. I mean, would those cases have come out differently in the Fourth Circuit? I would submit to you, Your Honor, that it wouldn't make any difference if you use a meaningful benefit standard, if you use a substantial benefit standard. Because the evidence from the teachers, from the progress reports, from the other standardized and criterion reference testing that was done from the child's own tutor, which didn't come from the school system, indicate that the child made substantial progress, substantial progress in every academic area. And the fact that there was one test, that was part of one test, remember, four of 22 subtests of one of seven tests given on one day to a child who'd missed, you know, almost 30 percent of the school year, doesn't vary the fact that, as Judge Ellis said, the evidence of progress, all the other evidence of progress, including the testimony of the teachers, swamps this one, which is really the only thing they rely on, piece of this Kennedy-Krieger report. And that would be true no matter what standard you apply. But I will say that, as a matter of law, I think that this Court has got it right in Abia v. Lawson. This has been the standard that this Court has consistently adopted. If you look at the changes that were made to IDEA, and there have been some changes, but there are things like revamping the disciplinary procedures, requiring more access to general curriculum. Here's an important one, ensuring that students have, are part of, that special education students are included in part of general assessments. Like in Virginia, we have the standards of learning. Requiring more teacher qualification, requiring more research-based intervention methods. But the core requirement to provide a quote-unquote appropriate education is the same now as it was in 1975. And Rowley is equally valid, as are this Court's decisions applying Rowley. And I think the other thing I should say is, I think if you look at a number of the other circuits, the Tenth Circuit, the First Circuit, and D.B. v. Esposito, what they really say, and this is consistent, Judge Motts, with you were referring before to Hall v. Vance County, is really saying that some benefit is the same thing as meaningful benefit or at least meaningful access. They're not really different. I mean, we cite it to this Casey v. Mansfield Independent School District case. I realize it's a district court case from elsewhere, but I referenced it and quoted it because I think the language is exactly right. Courts have used the term meaningful in interpreting Rowley or simply acknowledging that the Supreme Court meant what it said. Disabled children must receive a fair, appropriate education with some benefit. That is, the child's IEP must be likely to produce progress that is neither trivial or de minimis and certainly not produce regression. That really, I think, marries the A.B. v. Lawson and the Hall v. Vance County and their other decisions to say that the First Circuit says that in D.B. v. Esposito. So I don't think meaningful access or meaningful benefit and some benefit really are different. So you're okay if we now say meaningful benefit as opposed to some benefit? I honestly, with the understanding that I just gave. It has to be the same thing. That's correct. That's correct. And as I say, meaningful is something that comes right out of the Rowley case. I think it's a minority of circuits that have said that there really is a disparate standard. This is not one of them. So the appellate points primarily to the findings and the purposes that are listed by Congress therein in the amendments. And yet, as I've asked him to articulate, the definition of the FAPE has not changed by Congress. To what extent do we look at those findings and purposes when, in fact, the definition hasn't been changed in the statute itself, but nonetheless, the findings and purposes of that, even to the extent the congressional record itself indicates, well, we've kind of already met this access, but however, we've got to do more, so to speak. I think that the findings and purposes go more, Your Honor, to the statutory changes that were made. As I say, for example, requiring research-based instruction or requiring better teacher qualification or requiring that special education students be part of the overall group assessments like the standards of learning. That's the – oh, here's another one. Requiring that students – because one of the things they talk about is the problem of low expectations. One of the things that was done when the law was amended in 2004 is to create a greater burden on school systems for any deviation to moving students away from the general curriculum. Any deviations from the general curriculum have to be justified. That's in the statute. So I don't denigrate the purposes of some of the prefatory language, but that helps explain the statutory decisions, the changes that were made, not the ones that weren't. Just a couple other things that I wanted to make sure that I mentioned. We talked about fundamentally the school system's obligation is to offer a program that has a reasonable chance of offering some educational benefit. And we talked a lot about – and the briefing talks a lot about educational progress. We thought that was important, so we've briefed that at length. But I don't want to miss the point that really whether an IEP and a placement is appropriate is not just sort of a referendum on the amount of progress that was made last year, something that can be infected on a whole lot of different things, particularly for a student who's in kindergarten and first grade. What's required is it has to be a reasonable plan that has a reasonable chance of success. It has to identify the student's needs. And this IEP, as you see from the record, there were five different iterations of this IEP. The school system kept going back, what is it you don't like about this IEP? What can we do to change this? And so what's required or what the school system did is they added goals, additional objectives. They added additional – I'm talking about for second grade now. They added additional special education time. They added more time in a separate environment for the related services. So they did – it isn't as though they were just sitting on their hat for the year that was really at issue here. Is he still your client's student, as far as you know, as of today? The student at this point, I think, has been in a private school that the parents – been unilaterally placed by the parents since, I think, essentially the time of this. I understand your answer on the findings and purposes question I asked. But I do – I'm not – I just don't remember. Did the Raleigh court itself consider the findings and purposes section of it at the time it was enacted? It was decided. I believe the answer to that, Your Honor, is yes. I mean, they were riding on a completely clean slate trying to make some sense out of what Congress intended by this sort of open-ended mandate. And do you think their decision was influenced by the findings and purposes that was – or at least the decision itself was impacted to some extent that were in effect in 1982? Well, they were deciding the case against the historical background that they were deciding it against. But I would say to you that the core holding of Raleigh that appropriate means some, not the most or even, you know, some other higher threshold, is the same today as it was – equally valid today as it was. I got that one. I think we're clear that, you know, in terms of the position on that. I'm just trying to understand it because your opponent says there's a difference. And if they relied on the findings and purposes in 1982 and they're now different, the question is, has that changed that? I don't think I would say, just to answer your question, Your Honor, that the findings and purposes are fundamentally different. The idea was to provide some federal money to provide education for students with special needs. And, you know, that was true then and it's true now. And the findings and purposes that have been articulated in subsequent versions of the law speak more to the statutory – which don't include what appellant is contending for. Thank you. Thank you. Mr. McAndrews, you had a little time for rebuttal. Thank you. Judge Wynne, yes, Raleigh did look to the findings and purposes. They expressly, explicitly looked to the findings and purposes and expressly said the purpose of this Act is access. And Congress has now expressly and explicitly said the purpose of this Act is results. It couldn't be clearer. So any decision after 2004 should have reflected this so-called height and standard. If it didn't do it, it was wrong, at least in the circumstances. It's only wrong if somebody doesn't raise it, Your Honor. No, no, no, no, no, no. That's not true. Well, I mean, you know, if people aren't raising it to the Court's attention, the Court may not see it. I mean, let's face it. No Court is going to drill down on every aspect of every page of every Act. This is the first time that this has squarely been addressed with this Court. I mean, if an issue isn't raised— Unless the Fourth Circuit, in and of itself, articulated that higher standard from the beginning, because it's sort of my understanding of your argument that Raleigh actually did require a meaningful standard. It's just that some benefit came out, and some it sort of probably looked at as being lower, but the Fourth Circuit has seen, well, as your opponent says, at least articulates, it's the same thing. Boy, if it's the same thing, I can tell you that in practice it is worlds apart, and the definition is worlds apart. Some means unspecified. Meaningful means significant value. I mean— It wasn't just some, though. We said it had to be nontrivial, right? Yes. We don't dispute that. That's the law. Well, that's what has been articulated as the law. Respectfully, Your Honor, it's no longer the law. It cannot any longer be the law where the focus of the act is on results. Raleigh looked at the findings here, and it's not just findings, and that's to get back to your question, Your Honor. There have been many, many changes, substantive changes to IDEA that reflect those findings, and the most important was in 2004 IDEA for the first time required research-based instruction. So methodology is no longer just the blank slate that a teacher can do whatever they want to. It requires, as specially designed instruction, research-based instruction. That's why No Child Left Behind was created several years earlier, because 30 years of research that didn't exist in 1975 tell us that virtually all, with the exception of a few percentage of kids, can learn to read, write, compute, behave, socialize at grade level, and that's what IDEA is all about. Why wouldn't Congress, if it wanted to make this heightened standard, also change the definition of FAPE in the statute itself? They didn't really define it. In fact, that's what in Raleigh they said the definition really doesn't tell us. And so Raleigh defined it based upon the purpose of the act, which was access. And so Congress did exactly what it did in 1975. It stated here's the purpose of the act, set out the process, set out the substantive provisions, and the substantive provisions are very different today. Research-based instruction. But it would have been a clean way to do it. I mean, if Congress wanted to make this heightened, you change the statute. You don't send a shot across the bow. You can sink the ship if you go straight on and change the definition of it, and they didn't do it. And they knew what the definition that had been given by the court. Well, the thing is, Your Honor, there are now seven circuits who have used meaningful benefit, who have interpreted Raleigh. You can get to where I'm going two ways. You can say Raleigh really means meaningful benefit. That's what counsel for the school district said. And Judge Matz has said we can use that by saying that's what we've said the whole while. Well, this court has said it in the past. It needs to be meaningful. The benefit needs to be meaningful. It's also said it's some non-trivial benefit. And so the hearing officer, if you look at the hearing officer's decision here, it's over and over again, some progress, any progress, non-trivial progress. I mean, think of it in terms of our own lives, what the difference between something that's non-trivial and something that's meaningful. If we're talking about a relationship or talking about work that we did, there's a huge difference between something that's of some benefit or non-trivial and something that's meaningful. As the definition indicates, IDEA has changed in research-based instruction. It's changed by having robust transition programs for kids into adulthood and self-sufficiency. It now requires schools to align their special ed curriculum with the regular ed curriculum. It requires a new process to be available to identify kids with specific learning disability based on research-based instruction. And it emphasizes, and this is really important, it emphasizes the functional performance of kids. The word functional appears over 35 times in the current law. The kids' functional performance, how they actually operate, how they actually function. The word scientific appears 28 times. Mr. Gantrus, your time has expired. Maybe you can conclude. And it was zero in EHA, and I thank the Court. Thank you very much. We will come down and say hello to the lawyers and then take a brief recess.
judges: Diana Gribbon Motz, James A. Wynn Jr., Andre M. Davis